Julius HOBSON, et al., Plaintiffs,

v.

Charles D. BRENNAN, et al.,
Defendants.

Civ. A. No. 76–1326.

United States District Court,
District of Columbia.

Oct. 22, 1986.

As Amended Nov. 7, 1986.

Anne Pilsbury, Washington, D.C., Center for Immigrants Rights, New York City,

Armand Derfner, Charleston, S.C., for plaintiffs.

J. Frederick Sinclair & James DeSimone, Cohen, Dunn & Sinclair, P.C., Alexandria, Va., for defendant Brennan.

Brian P. Gettings & R. Scott Caulkins, Cohen, Gettings, Alper & Dunham, Arlington, Va., for defendant Moore.

William W. Greenhalgh, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for defendant Grimaldi.

A. Raymond Randolph & Susan Launer, Randolph & Truitt, Washington, D.C., for defendant Jones.

Earl J. Silbert & Patricia L. Maher, Schwalb, Donnenfeld, Bray & Silbert, P.C., Washington, D.C., for defendant Pangburn.

## MEMORANDUM

OBERDORFER, District Judge.

This matter is before the Court on remand from the Court of Appeals with instructions to conduct a new trial on the issue of damages.[1] *Hobson v. Wilson,* 737 F.2d 1 (D.C.Cir.1984) (Edwards, Scalia and Starr, JJ.), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). The Court of Appeals emphasized that, with the parties' consent, damages could be fixed by this Court on the basis of the evidence adduced at the original trial. 737 F.2d at 59, 66 n. 187. Four of the five FBI defendants have agreed to have the Court fix damages on this basis. One defendant, however, has demanded a new jury trial. Because a jury has special competence to determine damages for such things as pain and suffering, emotional distress, and damage to reputation where quantifying requires reference to common sense and broad experience in life, the Court planned to let the new jury fix the damages against the one defendant and sit as an advisory jury with respect to the claims against the

others. This plan has proved unworkable.[2] The Court has decided, therefore, to proceed with the damage claims against the four defendants on the existing record. This record has been illuminated by elaborate briefs, detailed proposed findings, and an extended argument. Of special significance, the record includes the verdict of the original jury. *See Hobson v. Wilson,* 556 F.Supp. 1157, 1188 (D.D.C.1982).

The Court of Appeals, while reversing judgments against the District of Columbia defendants, affirmed this Court's original "ruling on all other findings by the jury," including "the individual and conspiratorial liability of the FBI officers." 737 F.2d at 51. The Court of Appeals expressly stated that "[t]he evidence here *undoubtedly* sufficed to permit the jury to conclude that" the FBI defendants were participants "in a common and unlawful plan whose goals [were] known to all members." 737 F.2d at 55 (emphasis added). That evidence establishes, and the jury, this Court, and the Court of Appeals have concluded, that each of the four FBI defendants now before the Court did engage in a common and unlawful plan, knowing that it was unlawful. Thus, the Court of Appeals-approved jury verdict establishes as a fact that each of the FBI defendants here was a knowing party to a conspiracy formed and operated over several years (1) "to expose, disrupt and otherwise neutralize" the lawful activities of "people who opposed American involvement in the Vietnam War and other related policies of the national Government," (2) "to expose, disrupt, misdirect, discredit, or otherwise neutralize" the lawful activities of "people seeking improvement of civil rights for Black people," and (3) to create dissension and hostility, and thereby prevent cooperation, between Black civil rights groups and essentially

1. Filing of this Memorandum was delayed in deference to the parties' representation that they were close to settlement. This representation was made three weeks ago. This case was filed in 1976 and decided by a jury in 1981. The time for deference has now passed.

2. *See In re Gerould W. Pangburn,* C.A. 86–1326, Order (D.D.C. Sept. 17, 1986); *Hobson v. [Wilson] Brennan,* C.A. 76–1326, Order (D.D.C. Sept. 16, 1986); *Hobson v. [Wilson] Brennan,* C.A. 76–1326, Order (D.D.C. June 24, 1986).

White anti-war groups. 737 F.2d at 10. The Court of Appeals further determined:

> Whatever authority the Government may have to interfere with a group engaged in unlawful activity, and however it may be permitted to impede or deter rights of lawful association as a by-product of legitimate Government actions, it is *never* permissible to impede or deter lawful civil rights/political organization, expression or protest with no other direct purpose and no other immediate objective than to counter the influence of the target associations.

737 F.2d at 27 (emphasis in original).

The Court of Appeals essentially found "four categories of activity interfering with plaintiffs' legitimate protest activities: (1) efforts to create racial animosity between Blacks and Whites; (2) interference with lawful demonstration logistics; (3) efforts to create discord within groups or to portray a group's motives or goals falsely to the public; and (4) direct efforts to intimidate the plaintiffs." 737 F.2d at 11 (footnote omitted). Thereupon, the Court of Appeals enumerated significant examples of each activity:[3]

1. Distribution of false press releases calculated to tarnish the reputation of the late Julius Hobson, and incidentally, his wife.

2. The "Give Them Bananas" leaflet found by the Court of Appeals to be "blatantly wrongful." 737 F.2d at 56.

3. Distribution of fictitious housing forms to disrupt the logistics of a lawful demonstration against the Vietnam War.

4. Interference with a counterinaugural demonstration by giving disinformation to parade marshals.

5. Infiltration of meetings to stimulate dissension.

6. Intimidation of politically active persons through harassment and intrusive interviews.

The evidence also establishes and it is found as a fact that the FBI defendants engaged in:

1. Publication of a fictitious student newspaper designed to dissuade students from participating in lawful and peaceful political protest activity.

2. The inclusion of the names of plaintiffs Eaton, Waskow and Pollock on various government indexes, one of which marked Waskow for possible arrest and incarceration in the event of a serious national emergency.

In briefs and argument, counsel for defendants have pressed hard their contention that compensatory damages must be quantifiable and that it is impossible to quantify the damages proven here. It is true that in this case there are no monetary losses or physical injuries for which long experience has established guidelines. The Court of Appeals, and more recently the Supreme Court, has apparently concluded that the inherent value of a mere constitutional right is compensable only by nominal damages.[4] But in this case the Court of

---

**3.** 737 F.2d at 11–12.

**4.** *Memphis Community School District v. Stachura,* — U.S. —, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), involved a damage claim based on 42 U.S.C. § 1983. That decision may not apply to the deprivation of a constitutional right by a conspiracy defined and sanctioned under 42 U.S.C. § 1985(3). Nothing in this particular statute indicates that Congress intended only nominal damages for a citizen deprived of a constitutional right by a § 1985(3) conspiracy. On the contrary, that section equates injury to person or property with deprivation of a right or privilege of a citizen of the United States. It provides specifically:

> ... in any case of conspiracy ..., if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, *or deprived* of having and exercising any right or privilege of a citizen of the United States, the party so injured *or deprived* may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators. [Emphasis added.]

Nothing on the face of this statute indicates that Congress intended that the damages authorized by section 1985(3) for deprivation of a right or privilege would be limited to nominal damages while injuries to person (such as reputation) or to property would be fully compensable. It could have said so; it did not. *But see Hobson,* 737 F.2d at 60.

Appeals suggested a nonexclusive list of compensable injuries apparent in the record: injury to reputation, impairment of earning capacity, humiliation, and emotional distress such as embarrassment, fear, anxiety and anguish. 737 F.2d at 61, 62. These kinds of injuries are traditionally evaluated by juries and compensated for with damages. There was evidence in this case on which the jury could have found, as it did, that each of these plaintiffs suffered some such form of injury beyond effects on the inherent value of their associational rights.

The task of quantifying remains. One basis for quantifying is precedent. In *Dellums v. Powell*, 566 F.2d 167 (D.C.Cir. 1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978), the Court of Appeals determined that $7500 per plaintiff was excessive compensation for a single unlawful disruption of a demonstration at the Capitol in the 1960's; the parties later settled for $750 per person. In *Tatum v. Morton*, 562 F.2d 1279 (D.C.Cir.1977), compensatory damages of $100 per person for unlawful removal from the White House and some manhandling by police was set aside as inadequate. On remand, the trial court awarded $1000 for each unlawful arrest and $400 for each "strip search." *See Hobson*, 556 F.Supp. at 1191. More recently, a District Court in New York has applied the Federal Tort Claims Act to award to the Socialist Workers Party $264,000 in compensatory damages—$42,500 on account of FBI disruption activities, $96,500 for surreptitious entries, and $125,000 for use of informants. That court quantified the damage caused by each overt act at $2500. *Socialist Workers Party v. The Attorney General of the United States*, 642 F.Supp. 1357 (S.D.N.Y.1986) (Griesa, J.).

Another guideline, possibly more relevant to punitive damages, is furnished by 18 U.S.C. § 241, a criminal statute which authorizes a $10,000 fine,[5] plus imprisonment for up to ten years, for participation in a conspiracy to deprive a person of his civil rights. Specifically, the statute applies to any case in which

two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same.

A more directly applicable guideline is afforded by the jury verdict in this case. The Court of Appeals observed that the verdict form used here required the jury to determine the total damages owed by each defendant to each plaintiff; it did not delineate between the damages attributable to their individual acts and the effects of the FBI conspiracy. Nor did it identify the element of damages, if any, attributed by the jury to the FBI role in the alleged FBI–MPD conspiracy. 737 F.2d at 57.

In this area where limited experience with damages under section 1985(3) makes quantifying difficult, the common sense judgment of the jury is entitled to great weight. Indeed, as stated, when one of the defendants demanded a jury on remand, the Court attempted to seize the opportunity to engage that same jury as an advisory jury with respect to the claims against the other defendants. Although this plan has proved infeasible in the circumstances, it is possible to glean significant guidance from closer analysis of the damages awarded by the jury that did hear this case live—at the same time that this Court was hearing it. The Court of Appeals was understandably reluctant to parse and reconstruct the damage awards after it struck down the judgments against the Metropolitan Police Department ("MPD") officials. But those judges, unlike the trial judge, did not live through the trial and see and hear the witnesses and arguments of counsel. Accordingly, this Court has undertaken to reconstruct the verdict, guided by what the

---

5. *See* 18 U.S.C. § 241. The 1968 amendment enhanced the maximum fine from $5,000 to $10,000 and provided for life imprisonment if death occurs. Pub.L. No. 90–284, 82 Stat. 75 (1968).

jury decided *in toto,* and taking into account the after-thoughts expressed by this Court in ruling on the motion for a new trial, and by the Court of Appeals when it remanded for a new trial on damages.[6]

The jury award to eight plaintiffs against thirteen defendants including the District of Columbia was $711,937.50. The jury awarded two of the present plaintiffs, Eaton and Hobson, $81,062.50 and awarded plaintiffs Pollock, Waskow and Washington Peace Center ("WPC") $93,750 for a total of $443,375. The awards to Eaton and Hobson included $37,937.50[7] chargeable to the District of Columbia, and $10,312 chargeable to two MPD officers, leaving $32,812.50 chargeable to *five* FBI defendants. The awards of $93,750 to Pollock, Washow and WPC included $37,937.50 chargeable to the District of Columbia, plus $23,000 chargeable to seven MPD officers. The liabilities of the present defendants ranged from $75,000 against defendant Brennan to $37,500 against defendant Grimaldi. One third of each award was delineated as for punitive damages.

It is noteworthy in this connection that in their original challenge to the damage verdicts, defendants charged that the jury's action reflected "rigid arithmetical calculations." 556 F.Supp. at 1189. And, indeed, there is considerable indication that the jurors may have worked backward, fixing a total amount to which they determined that plaintiffs were entitled, and then dividing that sum between the defendants according to their level of responsibility and activity in carrying out the conspiracy. This jury's judgment was not infallible. But the jurors sat through a seventeen-day trial and deliberated for five days before they returned a verdict. Their sense of the amount required approximately to compensate plaintiffs for their injury caused by the FBI conspiracy is entitled to great weight in the unusual circumstances here.

As the Court of Appeals observed, the jury's findings cannot be applied directly to the changed circumstances. But they constitute legitimate bench marks for quantifying. Recognizing that damage-fixing is, at best, an inexact science, it is possible to extrapolate from those bench marks some factors to guide the Court to a final conclusion. First, the jury's verdict assumed that plaintiffs would recover from the District of Columbia and MPD officials as well as from the FBI defendants. Second, it is the Court's impression of the evidence and the argument in the original case that when the jury assessed damages, it focussed (as did the Court in framing the verdict form and otherwise) on the FBI conspiracy and the alleged MPD conspiracy and not on the alleged FBI–MPD conspiracy so that any value attributable to the latter conspiracy was *de minimis.*[8] Accordingly, in extrapolating from the jury verdict to determine damages the Court will reduce each award to eliminate roughly the portion attributable to the claims against the District of Columbia and the MPD officers, and then reduce that amount by one-third to eliminate, for the moment, the punitive damage claim. That liability will be assessed against the four defendants jointly and severally. They may, of course, be entitled to contribution, in an amount to be determined, from defendant Pangburn when his jury trial has run its course.

**6.** In this connection, it may be noted that defendants Brennan, Moore, Jones and Grimaldi agreed to a bench trial on the existing record, which necessarily includes this Court's own observations during the original trial.

**7.** In *Hobson,* 556 F.Supp. at 1188, the figure $37,973.50 was used. It is corrected above.

**8.** When this Court expressed its concern about the size of the verdict, it was substantially affected by the heavy burden such a verdict would inflict upon the individual defendants. Since then, the Department of Justice has announced a policy of indemnification by which any defendant determined by the Department to be too heavily burdened by the verdict can be reimbursed at least for compensatory damages. Statement of Policy Concerning Indemnification of Department of Justice Employees, 51 Federal Register 27021 (July 29, 1986), 28 C.F.R. Part 50. In any event, further study of the damage question persuades the Court that while a defendant's ability to pay is a relevant consideration in determining punitive damages, it was an inappropriate consideration in a post-trial appraisal of the damage award.

The damages assessed by the jury solely against the FBI defendants may be fairly identified as the damages (compensatory and punitive) due to each plaintiff from each FBI defendant. It has been tabulated as follows:

| | |
|---|---|
| Charles D. Brennan | $ 9,375 |
| George C. Moore | $ 7,500 |
| Courtland Jones | $ 5,625 |
| Gerald Grimaldi | $ 4,687.50 |
| Gerould Pangburn | $ 5,625 |
| Total damage award to each plaintiff chargeable to FBI conspiracy | $32,812.50 |

Since this sum included punitive damages identified by the jury as one-third of the total, the calculation should be adjusted accordingly:

| | |
|---|---|
| Original damage award to each plaintiff chargeable to FBI conspiracy | $ 32,812.50 |
| One-third deduction for punitive damages | $ 10,937.50 |
| Compensatory damages due each plaintiff per extrapolated jury verdict | $ 21,875.00 |
| Total compensatory damages (5 × $21,875.00) | $109,375.00 |

Using these bench marks: (1) the compensatory damage verdict of $21,875 for each plaintiff, (2) the bracketing of the target between a low $100 set aside in *Tatum*, and $7500 set aside as too high in *Dellums*, (3) the $10,000 fine authorized by 18 U.S.C. § 241, and (4) the $2500 per overt act assessed in the *Socialist Workers Party* case, the analysis will turn to particular claims.

▮ Arthur Waskow is a Ph.D. historian and was, at the relevant time, a fellow at the Institute for Policy Studies. In that capacity and as a concerned citizen, Waskow was actively involved in the civil rights and antiwar movements and became a member of the steering committee of the New Mobe. Waskow's activities were both peaceful and lawful. Nevertheless, the FBI marked him as a danger to national security and placed his name on the "Priority I" list of the "Security Index."[9] This listing marked Waskow as an element of the

> [t]op national and state leadership of basic subversive organizations, leaders of anarchistic groups, individuals who have shown greatest propensity for violence, as well as those who have special training in sabotage, espionage, guerrilla warfare, etc.

Plaintiffs' Exhibit 80 at 1 (a copy is attached as Appendix A). Persons on this list were subject to apprehension and arrest "when the Attorney General announces that their immobilization is in the best interests of the national defense of the United States." Plaintiffs' Exhibit 80 at 7. The list bearing Waskow's name was maintained, available, and, at least in that sense, published in the FBI, and available to other government security agencies.

Waskow learned that his name was on that list during discovery in this case. The emotional distress, intimidation and fear caused by discovery of the placement of one's name on a Security List of persons to be arrested in time of national emergency is obvious.[10] And the injury is heightened by Waskow's personal circumstances as an organizer of a small synagogue. *See* Appendix B (Tr. Trans. (December 1, 1981), Vol. 3, at 276). Defendants' knowledge of his background and their exploitation of it is evidenced by their sending to him a New York Times article reporting that there was anti-semitism in the Black United Front. Having observed Waskow as a witness and as a frequent spectator/party in these protracted proceedings, the Court infers and finds that he necessarily suffered emotional distress and humiliation when he learned that his name was among those listed in the Security Index and thereby marked by

---

**9.** *See* Tr.Trans. (December 1, 1981), Vol. 3, at 272. For an authoritative description of the Security Index, see *Socialist Workers Party, supra,* 642 F.Supp. at 1395–96.

**10.** Whatever may be the legality of national emergency plans which target for detention spies and saboteurs, there can be no basis for targeting for detention peaceful citizens on account of their purely political statements and actions. Such listing not only threatens that citizen, but all others who might be dissuaded from their peaceful political activity by the threat of inclusion on that list.

the conspiracy for summary arrest and incarceration in the event of a national emergency such as war or violent civil disturbance and that defendants knew, or should have known, that he would so suffer. The Court believes that the jury was heavily influenced by this factor in awarding Waskow a sizeable compensatory award, and further finds that a reasonable compensatory award for his consequent emotional distress and humiliation is $4,000.

Defendants contend that these injuries are not compensable because Waskow only learned that he had been marked for arrest and incarceration during discovery in this litigation. Obviously, the injury is the same no matter how Waskow discovered his peril. The conspirator or conspirators who put Waskow's name on the Security List because of his political activities knew, or should have known, that this was unlawful. They also knew, or should have known, that it was likely that his listing would be exposed by a congressional investigation, a newspaper reporter, a prosecution or a civil litigation such as this one, or by the occurrence of a triggering emergency, and that Waskow would be uniquely terrified by discovery of his listing, whenever it occurred. In any event, Waskow's claim of injury on account of his being listed in the Security Index has been in this case from the beginning. The evidence was before the jury. The Court of Appeals has affirmed the judgment on the verdict and gave no indication that this issue was improperly before the jury. For these reasons, defendants' objection is without merit.

Defendants also point to the Court of Appeals' directive on remand "to sort out whether each plaintiff testified to some form of distress." 737 F.2d at 61. In the absence of such direct testimony, defendants contend, no compensatory damages are awardable to Waskow. The defendants' construction of the term "testimony" as used by the Court of Appeals is overly narrow. They overlook the Court of Appeals' further statement that "in appropriate circumstances ... emotional distress may be inferred from the circumstances."

737 F.2d at 61 n. 173 (citing *Doe v. District of Columbia*, 697 F.2d 1115, 1124 n. 24 (D.C.Cir.1983)). These are such circumstances. Testimony about something so obvious would have been redundant and possibly viewed by the jury as so self-serving· as to be counter productive.

In addition to the Security Index matter, Waskow was the subject of extensive and intrusive investigation. For a period of three years, the FBI intercepted and read Waskow's business and personal correspondence, monitored his bank account, traced and noted his religious activities, and sent informers into private meetings attended by Waskow, for which he is entitled to $2,250 in damages. In addition, the FBI approached Waskow's neighbors and questioned them extensively about Waskow's personal and political activity. As a result of these interviews, some of Waskow's neighbors grew suspicious of him and thereafter disassociated themselves from him. For emotional distress and injury to reputation, Waskow is entitled to damages of $1,250.

Finally, Waskow is entitled to damages for injuries suffered as a result of what the Court of Appeals characterized as COINTELPRO's "blatantly wrongful" head tax/"feed them bananas" maneuver. 737 F.2d at 56. Waskow was a member for the New Mobe steering committee. Because of his involvement and concern with the inner city civil rights movement and his desire to reach out to minority action groups, including the Black United Front ("BUF"), Waskow alone suggested that the New Mobe consider acceding to the $25,000 head tax demand, purportedly made by the BUF. The issue was debated over a period of three months throughout which Waskow maintained his minority position. His efforts to accommodate the head tax demand placed him apart from the other New Mobe members, making him feel "very lonely," and causing him to agonize over a controversy which, unbeknownst to him, was fabricated and exacerbated by the COINTELPRO conspirators. Furthermore, as one of the purported authors of the Give Them

Bananas memo, Waskow's reputation and standing was injured among members of the BUF—persons with whom Waskow sought to cultivate associations. For the head tax controversy, Waskow is entitled to $350 as compensation for emotional distress. For the emotional distress and injury to reputation arising from the Give them Bananas memo, Waskow is entitled to compensatory damages in the sum of $150. In sum, the Court concludes that the evidence supports an extrapolated jury verdict of $8,000 in compensatory damages for Waskow.

■ Plaintiff Richard Pollock was a freshman at American University in 1969, and was a reporter on the student newspaper, *The Eagle.* He was also active in the Student Mobilization Committee (1969–70) and the People's Coalition for Peace and Justice (1971–73). The student newspaper and the latter organizations were all targeted by COINTELPRO/New Left. (Exh. 30, 103–5, 31A, 52, etc.). Individually, Pollock was a target of surveillance from 1970 to 1973. His name was placed on a security index (the "Administrative Index") and he was described therein as a person "potentially dangerous because of background, emotional instability or activity in groups engaged in activities inimical to the United States." The FBI circulated this listing and Pollock's photograph to other agencies in the United States government. There was no indication that Pollock, like Waskow, was marked for arrest in the event of a national disorder, but humiliation, emotional distress and injury to reputation were nevertheless the foreseeable and actual results of placing Pollock's name on a list of persons dangerous to the security of his country. Mr. Pollock is entitled to compensation in the amount of $2,000.

There is also evidence that the FBI followed Pollock and his companions for several hours in the middle of the night as he travelled by car from Washington, D.C. to West Virginia. Defendants dispute that the FBI was responsible for this, but there was sufficient circumstantial evidence to support a jury verdict and now a Court finding that what Pollock claims with respect to the actions of the conspiracy with respect to him is more probably true than not true. It is also more probably true than not true that he suffered humiliation, fear, and other emotional distress as a result of this harrassment. This is an appropriate element of compensatory damages, and Pollock is entitled to $1,500 on this account.

■ Pollock was a reporter on the legitimate student newspaper at American University and an organizer of anti-war demonstrations there when the FBI conspirators wrote, printed and circulated *The Rational Observer,* COINTELPRO's surreptitious student newspaper. *The Rational Observer* warned peace demonstrators that "they might be embarrassed later in life for their present activities," and cautioned them against participating in lawful political activity. An FBI memorandum later boasted that this operation had successfully decreased participation in demonstrations such as those that Pollock sponsored. 737 F.2d at 56 n. 156. The damage done to Pollock by the publication of *The Rational Observer* with resulting loss of supporters for his political activity is relatively difficult to quantify and is dissimilar from traditional jury-determinable damages. The injury is distinguishable from the "mere" deprivation of a constitutional right, but because of the difficulty of quantifying damages on the basis of the existing record, Pollock is entitled only to nominal damages for this deprivation. *See Memphis Community School District v. Stachura,* —— U.S. ——, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Accordingly, he is awarded $1 on account of *The Rational Observer.*

Finally, there was also evidence that the FBI interviewed Pollock while he was standing in a public place, i.e., an unemployment compensation line, in order to intimidate him on account of his political activities. During oral argument, counsel for one of the defendants suggested that Pollock could not have suffered any humiliation or emotional distress arising from the

incident because a person in an unemployment line has no pride. This argument is not well-taken. Nevertheless, there was insufficient evidence to relate the interview to the conspiracy here. There is evidence that at the time of the interview, the FBI interest in Pollock was not related to COINTELPRO. Accordingly, no damages will be awarded on account of the unemployment line interview.[11] In sum, the Court concludes that the evidence supports an extrapolated jury verdict of $3,501 in compensatory damages for Pollock.

■ Reverend David Eaton is Senior Minister at All Soul's Unitarian Church, a racially integrated congregation. He has been a leader in efforts to achieve harmonious race relations in this community and peace in the world. It is an understatement to describe him as law-abiding. During the time of COINTELPRO he was a leader in organizations and peaceful demonstrations for civil rights and racial peace. He was an active leader in the BUF. BUF had undertaken to combat drug sales in the Black community. The evidence supports a finding, and it is found, that the COINTELPRO conspirators composed and sent a spurious letter to all members of the BUF Board of Governors threatening death to all of them—except Eaton—unless the anti-drug program ceased. The letter embarrassed Eaton and inconvenienced and strained his relations with fellow members of the BUF Board. This letter was clearly designed to injure Eaton most particularly. The resulting emotional distress and injury to reputation entitles Eaton to an award of $3,000 for compensatory damages.

Eaton's efforts to support the Poor People's March were complicated by fraudulent charges surreptitiously planted by the FBI conspiracy. He was also subjected to severe emotional distress stirred up by defendants' exacerbation of the "Head Tax" controversy and, among other things, by the uttering of the "Bananas" leaflet. 737 F.2d at 12; 556 F.Supp. at 1183 n. 35. For these incidents, Eaton is entitled to $2,500.

Finally, the FBI listed Eaton on a so-called "Agitator Index" and circulated a report about his activities to other federal agencies, including the Secret Service, Defense Department intelligence agencies, and the local office of the United States Attorney. The jury could have fairly found, and this Court does find, that Eaton suffered humiliation and emotional distress over a substantial period of time from these disruptive activities and a diminished reputation among the personnel of the several agencies to which the FBI sent these reports about his activities. For this, Eaton is entitled to a compensatory award of $2,000. In sum, Eaton is entitled to $7,500 from the defendants.

■ The WPC proved COINTELPRO's interference with its efforts to conduct or support a demonstration by its manipulation of housing forms and the misdirection of marshal's instructions. 737 F.2d at 12, 57–58. For the resulting injuries, a reasonable compensatory award in the *Dellums/Tatum* bracket and reflecting the jury award is $5,000. The WPC also seeks damages for intrusion on its privacy and that of its members. These latter claims more resemble those identified by the Court of Appeals as meriting only nominal damages than they resemble the measurable common law type injuries, compensation of which the current jurisprudence seems to find more manageable. Thus, only nominal damages are recoverable and the total award for the WPC shall be $5,001.

■ Tina Hobson suffered both the kind of humiliation and embarrassment in her personal life and intrusion in her employment which are familiar to the common law. Tina Hobson is White. Her late husband, Julius Hobson, was Black. The FBI file contains a report about an affair between them at a time when they were engaged to be married. (Exhs. 99–3, 99–4). Later discovery of the FBI's gathering of this and other information about her per-

---

**11.** If liability had been found, or if the Court of Appeals should find liability on appeal, this Court establishes compensatory damages for Mr. Pollock in the sum of $1,500.

sonal pre-marital and marital relations with a prominent Black man necessarily generated anger, embarrassment and emotional distress. At a time when there was no occasion for such official inquiry, the intrusions were more likely than not the work of the managers of the COINTELPRO program to disrupt and discredit Black leaders. For these injuries, Hobson is entitled to $3,500 in compensation.

A preponderance of the evidence establishes that the FBI made pointed inquiries into Mrs. Hobson's civil service record at a time when she was not under consideration for a promotion or position warranting an investigation. This fact was noticed by her employer and brought to Mrs. Hobson's attention, to her embarrassment. (Exh. 99-7.) Compensation within the *Dellums/Tatum* guidelines, adjusted to the jury's verdict should be $1,500. Mrs. Hobson is therefore entitled to total compensatory damages of $5,000.

To summarize, compensatory damages are awarded as follows:

| | |
|---|---|
| Waskow | $ 8,000 |
| Pollock | $ 3,501 |
| Eaton | $ 7,500 |
| WPC | $ 5,001 |
| Hobson | $ 5,000 |
| | $29,002 |

■ The law of joint tortfeasance and conspiracy generally makes all co-conspirators jointly and severally liable for the damages caused by their conspiracy. Moreover, 42 U.S.C. § 1985(3) provides:

> ... in any case of conspiracy ..., if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, *the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.* [Emphasis added.]

This and general principles of law with respect to conspiracies establish that each of the defendants is jointly and severally liable for any damages required to compensate fully any person injured or deprived of a right by the conspiracy. Therefore, each defendant shares responsibility for contributing to the amount due each plaintiff to compensate that plaintiff for any injury or deprivation caused by the conspiracy.

The Court of Appeals, however, has pointedly cautioned "that damage awards must reflect disparities in responsibility among the defendants." 737 F.2d at 56. Happily, the jury verdict did just that in this case: its awards ranged from $9,375 chargeable to Brennan for each plaintiff to $4,687.50 chargeable to Grimaldi for each plaintiff. To honor the Court of Appeals' caution, the accompanying judgment will tentatively apportion the appropriate awards in the same percentage as the jury apportioned them, subject to possible reapportionment when the Pangburn verdict is at hand. Those judgments will be:

| | |
|---|---|
| Brennan | $10,001 (34.48%) |
| Moore | $ 8,001 (27.59%) |
| Jones | $ 6,000 (20.69%) |
| Grimaldi | $ 5,000 (17.24%) |

■ Punitive damages remain for consideration. The Court of Appeals dealt with the subject crisply, but only briefly, *Hobson*, 737 F.2d at 61, and there have been developments on the subject, particularly with respect to punitive damages in cases based on the Reconstruction Civil Rights laws. Most significantly, the Supreme Court declined in *City of Newport v. Fact Concerns, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), to assess punitive damages against a municipal corporation. Instead, the Court identified punitive damages against individual offending employees as the more efficient remedy/deterrent for constitutional torts committed with a "malicious intent to deprive plaintiffs of their rights or do them injury ... or with reckless or callous indifference to the federally protected rights." 737 F.2d at 63.

It is apparent from this entire record that the conduct of the leadership of the FBI which was responsible for the initiation and execution of the COINTELPRO program fits this definition. The tone and specifics of the Court of Appeals opinion about what it describes as the "notorious COINTELPRO operation" leave no doubt that it was of that view. 737 F.2d at 7. Moreover, it must be clear that whether or not the initiators of the program identified specifically these plaintiffs and aimed the program at them, FBI managers knew that people like them would be its "victims." 737 F.2d at 7. The plaintiffs chose not to name the most conspicuous and most responsible leaders of the FBI or the estates of those who are deceased. But, the Court of Appeals *per curiam* opinion denying a motion for rehearing makes it clear that this failure should not permit other lesser ranking participants to avoid responsibility. For, said the Court:

> In this case ... the defendants found liable by the jury (and whose liability has been sustained) could only have been found to have participated in the conspiracy, if at all, in a supervisory capacity, exercising substantial responsibility for developing and implementing a policy knowingly designed to thwart plaintiffs' exercise of their First Amendment rights. We are simply not dealing with federal agents who were acting without knowledge of or responsibility for the illegal objective of a government program, and we need not and do not hold that such agents may be held liable under a conspiracy theory.

737 F.2d at 66–67.

The Court of Appeals recognized defendant Charles D. Brennan as Chief of the FBI headquarters Internal Security Section from 1966 to 1970 and Assistant Director in charge of the Domestic Intelligence Division from 1970–1971. *See generally, Hobson,* 737 F.2d at 57. The Court of Appeals described him as responsible for the FBI's COINTELPRO–New Left activity in which position he had overall responsibility for COINTELPRO–New Left and COINTEL-PROL–Black Nationalist. The Court of Appeals observed, and the undisputed evidence shows, that he authored the FBI memorandum announcing the creation of COINTELPRO–New Left in 1968, and also authored a memorandum in 1971 recommending termination of COINTELPRO in 1971 because its secrecy had become compromised. Brennan also had executive responsibility for, and direct involvement in, the decision making process which preceded the publication of *The Rational Observer.* He is responsible in an executive sense for the "Bananas Memorandum" and the process which resulted in the inclusion of Waskow's name on the Security Index. Brennan's knowledge of the purpose and implications of listing a person such as Waskow on the Security Index is evidenced by a Memorandum dated April 30, 1968, from Brennan to Mr. W.C. Sullivan entitled "PROGRAM FOR APPREHENSION AND DETENTION OF PERSONS CONSIDERED POTENTIALLY DANGEROUS TO THE NATIONAL DEFENSE AND PUBLIC SAFETY OF THE UNITED STATES (DETPRO), SECURITY INVESTIGATIONS OF INDIVIDUALS." That Memorandum stated in part:

> With the emergence of the New Left and the intensification of activities by the racial militants and black nationalists, who are not affiliated with basic revolutionary organizations but because of their anarchist tendencies do present a threat to the internal security of the United States, it has become apparent that these individuals warrant inclusion on the SI.
>
> Many individuals on the SI, because of their violent tendencies and their representation of the top leadership of subversive organizations, are scheduled for priority apprehension. The administrative procedures developed to make these apprehensions are referred to as the Detcom Program. In an all-out emergency, all subjects whose names are in the SI will be considered for immediate apprehension.

Plaintiffs' Exhibit 80 at 6.

The jury plainly found Brennan (indeed all of the defendants) liable for punitive

damages. The Court of Appeals decision may be fairly interpreted as approving some award of punitive damages, subject only to consideration of the amount. In any event, this Court agrees independently with the jury's finding that Brennan acted or failed to act in the foregoing instances with reckless and careless indifference to federally protected rights of all of these plaintiffs and a host of other innocent people.

A question remains as to the measure. The jury assessed one-third of $9,375 or $3,125 per person. Congress authorizes a fine of $10,000, plus other sanctions for such conduct. This Court instructed the jury in this case without benefit of Justice Blackmun's opinion in the *Newport* case. With all those considerations in mind, the accompanying order will assess defendant Brennan $10,000 in punitive damages, $2,000 for each plaintiff.[12]

From 1967 to 1974, defendant George C. Moore held a position parallel to that of Brennan's. *See generally, Hobson,* 737 F.2d at 57. He was Chief of the Racial Intelligence Section in FBI headquarters with responsibility for implementation of COINTELPRO–Black Nationalist. The memorandum announcing that program went out over his name. That memorandum stated that the purpose of the Moore-supervised program was to "discredit" such groups as the Southern Christian Leadership Council and the Student Nonviolent Coordinating Committee. There is clear and convincing evidence that the notorious "Bananas" leaflet was seen by him and that, at a minimum, he failed to interdict it. Like Brennan, he acted and failed to act in reckless disregard of the constitutional and statutory rights of plaintiffs Ea-

ton and Hobson to pursue their lawful political activities without federal police interference, or the threat of it. Punitive damages in favor of Eaton and Hobson in the amount of $3,500 each will be assessed against defendant Moore.

Defendant Courtland Jones was, during the critical times, in charge of the FBI's Washington Field Office ("WFO"). As the Court of Appeals concluded:

> [D]efendant Jones acknowledged that he was in the position to approve or disapprove suggestions from the WFO, that he approved preparation of The Rational Observer and other COINTELPRO activities, and that it was part of his job to make sure that Bureau directives on implementation of both COINTELPROs were carried out.

737 F.2d at 56 (footnote omitted). Jones' supervisory responsibility in the implementation of COINTELPRO in the District of Columbia made him personally responsible for acts taken by the COINTELPRO conspiracy in the District of Columbia with reckless indifference to the federally protected rights of all the plaintiffs. Punitive damages in the amount of $3,000 to be shared equally among the plaintiffs are indicated in the circumstances.

An additional punitive penalty is in order against defendant Gerald Grimaldi because of his responsibility for *The Rational Observer.* 737 F.2d at 57. Any government official who authorized or participated in composing and publishing a newspaper surreptitiously to influence the political views and discourage the peaceful political actions of college students plainly acted with reckless and callous indifference to values protected by the First Amendment to the Constitution. The Court of Appeals has

---

**12.** If the Department of Justice is considering indemnification of any defendant for punitive damages, its attention is invited to footnote 30 of the *Newport* decision, stating that:

> A number of state statutes requiring municipal corporations to indemnify their employees for adverse judgments rendered as a result of performance of governmental duties specifically *exclude indemnification for malicious or willful misconduct by the employees.* [Citations omitted.] *See generally Messersmith v.*

*American Fidelity Co.,* 232 N.Y. 161, 165, 133 N.E. 432, 433 (1921) (Cardozo, J.) ("[N]o one shall be permitted to take advantage of his own wrong ..."). Commentators have encouraged this development. *See* G. Calabresi, The Costs of Accidents 269–270 (student ed. 1970); Project, Suing the Police in Federal Court, 88 Yale L.J. 780, 818 (1979).
453 U.S. at 269 n. 30, 101 S.Ct. at 2761 n. 30 (emphasis added).

already approved a punitive damage award of $1,562.50 against defendant Grimaldi in favor of plaintiff Eaton. This penalty should also be in the amount of $1,562.50 in favor of plaintiff Pollock.

In fixing the amounts, the Court has taken into account the pleas in oral argument that these defendants face liability for $300,000 or more in attorneys' fees, and will proceed promptly to a determination of the fee liability.

Meanwhile, an accompanying order directs the entry of judgments in conformity with the foregoing findings and conclusions.

## APPENDIX A

TO: Mr. W.C. Sullivan

FROM: C.D. Brennan

SUBJECT: PROGRAM FOR APPREHENSION AND DETENTION OF PERSONS CONSIDERED POTENTIALLY DANGEROUS TO THE NATIONAL DEFENSE AND PUBLIC SAFETY OF THE UNITED STATES (DETPRO)

SECURITY INVESTIGATIONS OF INDIVIDUALS

SYNOPSIS: This is to recommend obtaining Departmental approval for amended criteria for individuals on Security Index (SI) and to set up Priority Apprehension Program based on dangerousness of individuals on SI. Present criteria for SI include individuals in basic revolutionary groups, front groups, anarchists, and those with anarchistic tendencies. Department has recently amended definition of a dangerous person in new Presidential Emergency Action Document 6, broadening it to include terrorists or persons who would interfere with Government operation and defense effort.

With Director's approval, conference was held with Departmental representatives and in view of amended definition of a dangerous person referred to above, a corresponding amendment to Item D of SI criteria was agreed upon. (Set out in details, page 7, and page 1 of memorandum to Mr. Yeagley) In addition, our study of the entire Emergency Detention Program suggests desirability of alterations to set up priorities for apprehension based on dangerousness of individual. Priorities would include:

1) Priority I. Top national and state leadership of basic subversive organizations, leaders of anarchistic groups, individuals who have shown greatest propensity for violence, as well as those who have special training in sabotage, espionage, guerrilla warfare, etc. Subversives in key defense facilities to be included. Present individuals designated Key Figures would, if appropriate, be in this category. Key Figure Program discontinued. Residences and employments will be verified each 3 months and reports submitted semiannually.

2) Priority II. Second level leadership and individuals who present significant threat but are in less influential positions than Priority I. Verification of residences and employments each 6 months with submission of annual reports as now required on majority of subjects.

3) Priority III. All other individuals on SI. Made up mainly of rank and file members. Verification of residences and employments to remain at 6 months with submission of reports each 2 years.

4) Each priority will be broken down into nationalistic tendencies and organizational affiliations so that apprehensions can be made in each category on a selected basis.

5) Changes will not alter total number of individuals on SI and not materially affect SI.

OBSERVATIONS:

Implementation of program will continue to require authorization of Attorney General for any apprehensions. Priority lists will streamline effectiveness of Program to allow us to "zero in" on most dangerous and influential individuals and will permit us to "lop off" top level immediately if Program implemented. This should result in paralyzing organizations, and subjects with lesser priorities would lose top leadership and could be apprehended at later

time, if necessary. Since SI made up principally of rank and file, we will save approximately 3,500 reports per year while at same time we will intensify coverage of those considered most dangerous. This presents logical and workable program while cutting back substantially on desirable but unnecessary paper work and is in line with our continuing analysis to streamline by cutting out unnecessary requirements and retaining only that which is absolutely essential.

RECOMMENDATION:

That attached letter to Department setting forth above proposals be forwarded. Upon Department's approval, appropriate instructions and manual changes will be sent to the field.

DETAILS:

The responsibilities of the FBI with respect to investigations in the internal security field have been established by Presidential Directives.

The primary purpose of the investigation of subversive individuals is to determine their identities and activities and/or whether they present a serious threat to the internal security of the country. If investigation develops positive evidence indicating that an individual presents a threat or potential threat to the internal security, his name is included in the Security Index.

The Security Index contains names of individuals who should be considered for immediate apprehension and detention in the event of a national emergency in order to safeguard the internal security of the United States by preventing sabotage, espionage, and insurrection. The list now consists of over 10,000 names. Additions and deletions are made when it is determined that the individual either represents a threat or no longer represents a threat.

A plan of action has been prepared to implement the apprehension and detention of individuals listed in the Security Index and for the seizure of specified contraband. This plan is formally known as the "Program for Apprehension and Detention of Persons Considered Potentially Dangerous to the National Defense and Public Safety of the United States." Details concerning this plan are contained in the Attorney General's Portfolio, copies of which were originally furnished to this Bureau on August 3, 1948. The proposed actions have been subject to continuous study, and revisions have been made as needed. The proposed actions under this plan will be implemented by Presidential Proclamation through Presidential Emergency Action Documents (PEAD). The PEADs provide for the arrest and detention of all persons, citizens as well as aliens, who are considered dangerous to the national defense and public safety and for the seizure of property which there is a reason to believe may be used to the detriment of national defense and public safety.

The results of our investigations are provided to the Department of Justice on a continuing basis for its concurrence and approval of the persons listed for apprehension.

Detailed instructions are in the hands of all of our field offices for the handling of this matter in the event we are called upon to effect apprehensions of SI subjects. Plans are also in existence in seven field offices for the handling of detainees on a temporary basis by the Army, and close coordination is maintained between our offices and the military. Departmental instructions from the Attorney General to United States Attorneys, who will be the administrators of the program following implementation, and to U.S. Marshals have been furnished our offices at the Department's request for delivery to these officials. The Immigration and Naturalization Service is responsible for the detention of alien enemies, and on a quarterly basis, through the Department, the number of all aliens included on the SI is furnished to them. This list is broken down by field office and by sex.

The criteria for placing and retaining individuals was approved by the Department on April 11, 1955. They are as follows:

A. Membership or participation in the activities of a basic revolutionary or-

ganization within the last 5 years as shown by overt acts or statements established through reliable sources, informants or individuals.

B. Membership or participation in the affairs of one or more front organizations, which adhere to the policies and doctrines of a revolutionary group, in a leadership capacity or by active substantial participation in the furtherance of the aims or purposes of the front organizations within the last 3 years as shown by overt acts or statements established through reliable sources, informants, or individuals.

C. Investigation has developed information that an individual though not a member or a participant in the activities of a subversive organization, has anarchist or revolutionary beliefs and is likely to seize upon the opportunity presented by a national emergency to endanger the public safety as shown by overt acts or statements within the last 3 years established through reliable sources, informants, or individuals.

D. Although investigation has failed to establish overt acts or statements on the part of a subject within the time limits set out above, facts have been developed which clearly and unmistakably depict the subject as a dangerous individual who could be expected to commit acts inimical to the national defense and public safety of the U.S. in time of emergency.

In November, 1967, the President ordered a comprehensive review of the Presidential Emergency Action Documents as to the desirability of modifying or deleting certain standby orders. The Attorney General served as the chairman of the committee reviewing the documents. After extensive review, in which the FBI participated, a proposal was submitted to the President that certain documents be revised. It was proposed that the Emergency Detention Program be revised to agree with the provisions of the Emergency Detention Act.

The Internal Security Division (ISD) of the Department has raised questions as to the ability to discharge the responsibilities of the Attorney General under the Emergency Detention Act of 1950. By letter dated 2/26/68 the Department requested a conference with the FBI for the purpose of reviewing the implementation of the Emergency Detention Program. The Director approved memorandum C.D. Brennan to Mr. W.C. Sullivan dated 3/1/68, captioned "Presidential Emergency Action Documents," designating Section Chief C.D. Brennan and SA Philip F. Enlow, Internal Security Section, Domestic Intelligence Division, to attend discussions with ISD.

One of the changes in PEAD pertains to the definition of a "dangerous individual." The document, which has been approved by the President, now states "The Attorney General, acting through such officers and agents as he may designate for the purpose, shall apprehend, and by order detain, pursuant to the provisions of the Emergency Detention Act, each person as to whom there is reasonable ground to believe that such person probably will engage in, or probably will conspire with others to engage in, acts of espionage and sabotage, including acts of terrorism or assassination and any interference with or threat to the survival and effective operation of the national, state, and local governments and of the national defense effort. As used in this section, the term 'person' shall mean any citizen or national of the United States, or any citizen, subject or national of any foreign nation, or any stateless person."

The above is an all encompassing definition of a "dangerous person." This will extend the criteria for the Security Index.

During the conference of 4/22/68 with ISD, the definition of a dangerous individual was discussed, and it was decided that Item D of the SI criteria should be expanded to include the definition as stated in the new PEAD 6. It was also determined that prior to implementing the EDP under the EDA additional planning and prepositioning of necessary forms and documents must be completed by the Department.

We are continually examining our procedures and policies to eliminate everything except absolute essentials. We have made a study of the Priority Apprehension Program procedures to insure that they are both current and meaningful. We also are taking a hard look at the individuals on the SI to justify their retention.

With the emergence of the New Left and the intensification of activities by the racial militants and black nationalists, who are not affiliated with basic revolutionary organizations but because of their anarchist tendencies do present a threat to the internal security of the United States, it has become apparent that these individuals warrant inclusion on the SI.

Many individuals on the SI, because of their violent tendencies and their representation of the top leadership of subversive organizations, are scheduled for priority apprehension. The administrative procedures developed to make these apprehensions are referred to as the Detcom Program. In an all-out emergency, all subjects whose names are in the SI will be considered for immediate apprehension.

Our study indicates the necessity for establishing new priority apprehension procedures which will continue to be based on potential dangerousness of the individual. Accordingly, the following suggestions are being made:

1. That the Priority Apprehension Program be continued under the code name Detcom; that the program be divided into 3 priority levels and be named separately.

2. That the first priority apprehension list be entitled Priority I. This list should consist of hard core national and state basic revolutionary organization leaders and those leaders of other subversive organizations and unorganized groups and individuals who have indicated a propensity for violence and/or have received special training in sabotage, espionage, and/or guerrilla warfare. If appropriate, individuals employed in or having access to key and/or defense facilities will be included on this list. It is believed that if these individuals are apprehended as scheduled this will completely disrupt the subversive organizations and should diminish possible actions by the remaining membership. These individuals will be apprehended only when the Attorney General announces that their immobilization is in the best interests of the national defense of the United States.

3. That a secondary priority list be entitled Priority II. This group should consist of the second level leadership of basic revolutionary organizations and other subversive organizations or other individuals who present a significant threat but are in less influential positions than those in Priority I. These individuals will be apprehended only when the Attorney General announces that their immobilization is in the best interests of the national defense of the United States.

4. That a third priority list be entitled Priority III. This list will consist of all other individuals who are on the SI. It will be made up mainly of rank and file members of basic revolutionary organizations and other subversive organizations, as well as other individuals whose activities warrant inclusion on the SI. These individuals will be apprehended only when the Attorney General announces that their immobilization is in the best interests of the national defense of the United States.

5. That Item D under the SI criteria be expanded to read:

"Although investigation has failed to establish overt acts or statements on the part of a subject within the time limits set out above, facts have been developed which clearly and unmistakably depict the subject as a dangerous individual who could be expected to commit acts inimical to the national defense and public safety of the U.S. in time of emergency. Such acts could include acts of terrorism, assassination, or any interference with or

threat to the survival and effective operation of the national, state, and local governments and of the defense effort." (Amendment is portion underscored.)

6. That certain individuals in the time of international or national crisis, because of their nationalistic tendencies, organizational affiliation, and/or anarchist tendencies, will be apprehended on a selected basis. All individuals on the SI are tabbed as to their nationalistic tendencies or organizational affiliations.

7. That the residences and employments of individuals on the Priority I list be verified every 3 months instead of every 6 months; that reports be submitted every 6 months.

8. That the verification of residences and employments of individuals on the Priority II list remain at 6 months; that reports be submitted on an annual basis.

9. That the verification of residences and employments of individuals on the Priority III list remain at 6 months; that reports be submitted every 2 years.

10. That the category "Key Figure" be deleted, since it will fit into Priority I; that the category "Top Functionary" be continued.

Each individual case will continue to stand on its own, and the decision to consider an individual for Priority apprehension will be based on his subversive activities and revolutionary tendencies.

It is believed that the above suggestions will strengthen our procedures in making priority apprehensions as well as conserve agent time without damaging the caliber of security investigations of individuals. These changes will not alter total number of individuals on the SI and will not materially affect it.

The establishment of priority lists will lend itself to accomplishing the purpose of the SI. W will be in a better position to "zero in" on the most dangerous individuals, and this will permit intensification of

investigations on them, should it be necessary. This will also set them up as prime targets for immediate apprehension in a practical working vein. This will enable us to "lop off" leadership of the subversive and dangerous groups immediately. Group activity will be paralyzed by depriving them of leadership. This will also tend to nullify the total influence and activity of this type of organization.

The more strict procedure of verification of residences and employments of every 3 months instead of 6 months for Priority I list will greatly assist in maintaining knowledge of the whereabouts of these individuals, which is as it should be.

The size of each Priority list cannot be determined until a review of the SI has been completed. It is estimated that Priority I will be approximately 750–1000, Priority II 2,500, and Priority III, 7,000.

The SI is made up principally of rank and file members; therefore, the greatest effect on our work will result from the proposal for Priority III.

The adoption of the proposals will result in the saving of agent and clerical time both at SOG and in the field in preparation and handling of approximately 3,500 reports a year.

The field will promptly report any unusual or important changes concerning a subject.

This will also release agent investigative time to concentrate on those individuals deemed more dangerous and at the same time not lose control over lesser subjects.

The field will continue to be required to know the current whereabouts of all subjects.

It is believed that this program is logical and workable and is in line with our continuing analysis to streamline our work. We are substantially cutting back on desirable but unnecessary paper work by cutting out unnecessary requirements. It is believed these proposals will greatly improve the efficiency of our work.

*Hobson v. Brennan,* C.A. 76–1326

Testimony of Authur Waskow,

December 1, 1981

Tr. Trans., Vol. 3, at 268–76, 279–80.

DIRECT EXAMINATION (continued)

BY MS. PILSBURY:

Q. Mr. Waskow, does your FBI file contain in addition to letters and checks any other documents that appear to come from your office?

A. There were a number of interoffice memos between me and other fellow faculty of the Institute, seminars that we were planning, research projects we were planning, proposals to foundations that were in the file.

Q. Are these documents which would have normally been available to the public in any means that you can think of?

A. No.

Q. Were there also—were there any documents in your own handwriting?

A. Yes.

Q. What sort of documents?

A. There were drafts of pieces of books, or pieces of articles, or pieces of public statements about specific issues, but they were drafts and that is why they were in my own handwriting.

Q. And what normally happens to those sort of drafts in your office?

A. Well, they would normally have been typed by a secretary and given back to me to check against the typed version and then the typed version would have been—the final version would have been sent to whatever it was, and the handwritten one would have been thrown away.

Q. Were there any other items taken from your office or that appear to have been taken from your office?

A. A typewriter ribbon was taken from the office.

\*     \*     \*     \*     \*     \*

Q. Was this a fresh typewriter ribbon or a used typewriter ribbon?

A. A used one.

Q. And what reference is made to the typewriter ribbon in your file that you can recall?

A. The reference is that the Metropolitan Police Department had gotten this ribbon and turned it over to the—was turning it over to the FBI.

Q. Was there any indication of what had been typed on the ribbon?

A. There was no description of what had been typed on the ribbon.

Q. Is there any other reference in your file to the Metropolitan Police Department?

A. Well, there are references scattered in a number of places. The major ones I remember were about the fact that material taken from the Institute had been taken by the Metropolitan Police Department and was being made available by the Metropolitan Police Department to the FBI.

Q. Does your file indicate whether or not you were ever overheard by any electronic surveillance?

A. Yes, it does.

Q. Did there come a time when you learned whether or not you were listed on an index called the Security Index?

A. Yes.

Q. When was that?

A. When I saw the file after this case was brought.

Q. And do you recall whether your file indicated that you were listed on this Security Index?

A. In 1969.

Q. And are you familiar with the FBI's criteria for—excuse me. Does the Security Index contain categories according to your file?

A. Yes, there are lists of priorities.

Q. And do you recall what your priority was?

A. Priority 1.

Q. Do you recall if the FBI had criteria for listing people on the Security Index?

A. Yeah, on general I don't—

THE COURT: The question is whether you are familiar, that's all.

BY MS. PILSBURY:

Q. Do you recall specifically what the criteria are?

A. I would need to look at the document to see the specifics, remember the specifics.

Q. Okay, I'm going to show you a document marked as Plaintiff's Exhibit 80 and ask you to look at that and see if that refreshes your memory.

A. Yes, it does.

Q. Okay. Can you indicate for the jury what the criteria are for listing people as priority 1 on the Security Index, according to the FBI?

A. Basics of subversive organizations, leaders of anarchist groups, individuals who have shown the greatest propensity for violence, those with special training in sabotage, espionage and guerilla war, et cetera, subversives in key defense facilities.

Q. Now, Mr. Waskow, let me ask you a couple of questions about that. Were you at this time working in a defense facility?

A. No.

Q. Did IPS have any defense contracts?

A. IPS had no government contracts at all.

Q. Have you ever had any training in sabotage?

A. No.

Q. Espionage?

A. No.

Q. Or guerilla warfare?

A. No.

Q. Were you a member of any organization that you feel could be characterized as an anarchistic group?

A. No.

Q. Or a subversive organization?

A. No.

Q. Do you know from looking at FBI documents what the purpose of the Security Index was?

A. I remember very vividly. It says the idea was to lop off the leaders who were listed on it, and then it goes on to explain that if the Attorney General decided, that the people in priority 1 or maybe the whole Security Index would be rounded up and detained without criminal charges or anything, but just detained by the Government.

Q. Okay. Do you recall whether you were on the Security Index in any years other than 1969?

A. In 1970—I don't—I think it went on to '71, at least. I don't remember when not.

Q. Now, in general, what effect, if any, do you feel that the FBI and/or the D.C. Government's interest in your activities has had on your political and personal life?

A. Well, there were a number of occasions when it made serious problems. The tension, for instance, that was caused by that whole business between the Black United Front and Mobilization made it difficult to impossible—I think impossible—for the peace groups to work at all with organizations in the black community in D.C. at least, maybe other places. And inside the Mobilization as I guess I mentioned, there was, I felt, a lot of tension directed toward me because I tended to support the original Black United Front proposal. And there was a lot of tension and suspicion as to why I supported that. There was a kind of a sense inside the Institute once—there was a sense that we needed to be very careful about talking to each other even, even with telephones around, and so on, without anybody else there, and very careful in talking in seminars, not to talk about proposals that we were developing. And it made it very difficult, much more difficult for us to work out a research proposal or work out a proposal to a foundation once it became apparent that there might be FBI people or police people involved either in the seminars or in actually taking the draft

proposals. It was the pressure. I mean, when you're writing a book or trying to write an article, and you're doing a draft, and you write it out, and you expect you know that it's going to get typed and et cetera—it is also a pressure to know that, you know, when you are experimenting with a way of writing, with an idea, et cetera, it's a pressure to know that somebody else, especially a police agent or police agency, is reading the first drafts of your ideas and putting them away in a file somewhere. So that was a real problem in terms of doing research and in terms of writing and working with other people at the Institute. And I continued doing—I mentioned the Freedom Seder and what that is based on, and I continued doing religious work and the rest from 1971 and 1972 on. I was very much involved in a small synagogue, and there was always lurking over my shoulder the idea that if we in that religious group in the synagogue try to do anything that was religious, social action, about poverty, about war and peace—that if the FBI was poking around in the Freedom Seder, and the police were poking around in the Freedom Seder, that we would also have to worry about whether they were poking around what the groups called farbrangen—it's coming together. This is a synagogue—

\* \* \* \* \* \*

BY MS. PILSBURY:

Q. Mr. Waskow, when we stopped, I believe you were describing an activity which you refer to as Fabrangen. Could you just indicate in time when you became involved in that?

A. The beginning of 1971 when it was founded and continuing until now.

Q. Okay. And—had you finished your answer?

A. No.

Q. Go ahead, please.

A. I was very much involved in Adams Morgan Community Council and other—and the Adams and Morgan school activities. And the FBI went to a number of neighbors of mine asking questions about the work, the political work that my wife and I were doing against the war. And some of the neighbors came to us and told us, and it was again noticeably cooler. It was a lot harder to do the kind of community work that I had been doing in the neighborhood around the schools question and the neighborhood questions after that.